**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| HENRY SHEBITZ, derivatively on behalf of CBL & ASSOCIATES PROPERTIES, INC., | |
| Plaintiff, | **C.A. No. _____** |
| vs. | |
| STEPHEN D. LEBOVITZ, CHARLES B. LEBOVITZ, FARZANA KHALEEL, GARY L. BRYENTON, A. LARRY CHAPMAN, MATTHEW S. DOMINSKI, JOHN D. GRIFFITH, RICHARD J. LIEB, GARY J. NAY, and KATHLEEN M. NELSON, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| CBL ASSOCIATES PROPERTIES, INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

## INTRODUCTION

Plaintiff Henry Shebitz ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant CBL & Associates Properties, Inc. ("CBL" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Stephen D. Lebovitz, Charles B. Lebovitz, Farzana Khaleel, A. Larry Chapman, Matthew S. Dominski, John D. Griffith, Richard J. Lieb, Gary J. Nay, and Kathleen M. Nelson, (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of CBL, unjust enrichment, waste of corporate assets, and violation of Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding CBL, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by CBL's directors and officers from at least November 8, 2017 through the present (the "Relevant Period").

1

2.     According to CBL, it is a self-managed, self-administered, fully integrated real estate investment trust ("REIT"). Through its operating partnership, CBL & Associates Limited Partnership (the "Operating Partnership"), CBL owns, develops, acquires, leases, manages, and operates regional shopping malls, open-air and mixed-use centers, outlet centers, associated centers, community centers and office properties. CBL's properties are located in 26 states, primarily in the southeastern and midwestern United States. The Company elected to be considered a REIT for federal income tax purposes.

3.     In accordance with its classification as a REIT, the Company must distribute 90% of its quarterly earnings as dividend payments to shareholders. This practice, which is required by the Internal Revenue Service, results in relatively little cash recorded in CBL's quarterly balance sheets.

4.     The Company is subject to federal securities laws and must follow the Financial Standards Accounting Board's generally accepted accounting principles ("GAAP"); both of these regulatory systems require public companies to disclose material[1] threats to their cash holdings in their Form 10 (quarterly or annual) SEC filings.

5.     Large lawsuits against a public company are indisputably among the threats that must be disclosed in a company's Form 10 filings. To fulfill the SEC's disclosure requirements under Item 303, 17 § 229.103, the form must provide, in a section titled "Legal Proceedings": (a) the fact that a material lawsuit has been filed against the Company, (b) the essence of the claims, (c) the significance of any potential loss, and (d) the amount of any claims, if estimable. The Form 10 financial statements also must account for a "reserve" from which potential payments could be

---

[1] Under SEC Item 303, Instruction 2, public companies do not have to disclose such litigation if claims involve less than 10% of its "current assets." CBL's REIT status means that its current assets are equal to its cash plus its accounts receivable, which would have equaled about $100-120 million during the Relevant Period (according to Zack's: https://www.zacks.com/stock/quote/CBL/balance-sheet).

made, in the event of an adverse judgment.[2] These disclosure requirements exist to help investors accurately evaluate the company's risks.

6.      From November 8, 2017 to March 1, 2019, the Individual Defendants failed to disclose just such a threat: the pendency of a massive class action lawsuit against CBL, which had the potential to incur hundreds of millions of dollars in liability.

7.      During the Relevant Period, the Individual Defendants permitted the Company to take advantage of small business customers who rented mall space owned by the Company by (1) unlawfully overcharging these retail tenants for electricity costs; (2) misrepresenting that the electric bills they received were not marked up; (3) hiding the fraudulent scheme by invoking audit waivers included in Company leases and; (4) reaping ill-begotten gains from such improper activity (the "Overcharge Misconduct"). Consequently, the Company was subject to a class action lawsuit filed in the United States District Court for the Middle District of Florida, captioned *Wave Length Hair Salons of Fla., Inc. v. CBL & Assocs. Props.*, No. 2:16-cv-206-PAM-MRM (M.D. Fla. Nov. 25, 2016) that claimed, *inter alia*, that the Company engaged in a pattern of racketeering activity by surreptitiously overcharging its tenants through a criminal enterprise by as much as 100% for its own profit (the "Racketeering Litigation").

8.      The Racketeering Litigation, brought by several of CBL's retail tenants, claimed that for several years the Company had overcharged them for electricity, despite a contractual agreement to provide electricity at cost, to keep the excess for profit.

---

[2] Under GAAP Rule ASC 450, loss contingencies must be accrued in financial statements when the loss is probable and fairly estimable. ASC ¶ 450-20-25. If the loss has not reached the degree of likelihood to require accrual, the contingency still has to be disclosed if the loss is even 'reasonably possible.' ASC ¶¶ 450-20-50-3. It is even possible for threatened litigation, yet unfiled, to be sufficient to require disclosure of a loss contingency. See ASC ¶ 450-20-50-6. If a fair estimate is not possible, the disclosure can simply specify that "an estimate cannot be made." ASC ¶ 450-20-50-4.

9.     The Racketeering Litigation plaintiffs put forward several claims, most notably under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), under which claimants may seek treble damages. The case involved a class size of 4,800 people and the potential for treble damages, which brought the risk to $180 million in liability without attorney's fees. Thus, the Racketeering Litigation was indisputably a 'large' lawsuit that did not "arise[] in the ordinary course of business," as CBL maintained in its SEC filings from November 2017 until March 2019.

10.    CBL's motion to dismiss the Racketeering Litigation was almost entirely denied on April 11, 2017, save for a count for breach of the implied covenant of fair dealing.

11.    On September 20, 2017, Catlin Specialty Insurance Company ("Catlin"), CBL's insurance provider, won a declaratory judgment in Delaware state court ruling that Catlin had no obligation to cover the Company in the event that the latter incurred liability in the Racketeering Litigation. *See Catlin Specialty Ins. Co. v. CBL & Assocs. Props.*, No. N16C-07-166 PRW CCLD, 2017 Del. Super. LEXIS 471 (Super. Ct. Sep. 20, 2017).

12.    On January 7, 2019, the federal court partially granted the Racketeering Litigation plaintiff's motion to certify the class under RICO and the Florida Deceptive and Unfair Trade Practices ("FDUTPA"), and on January 23, 2019, the federal court denied the Company's motion for summary judgment, greatly accelerating the litigation.

13.    On March 1, 2019, CBL finally revealed the existence of the Racketeering Litigation to the public in its annual report for the fiscal year ended December 31, 2018, filed on a Form 10-K with the SEC (the "2018 10-K"). However, the 2018 10-K still omitted material facts about the litigation, divulging neither the degree of risk nor the amount-in-controversy (up to $180 million without attorney's fees) to shareholders, in clear violation of SEC and GAAP regulations.

4

14.     Following this partial disclosure, CBL stock dropped by $0.16 per share (8%) from the previous trading day, to close at $1.98 on March 1, 2019.

15.     On March 15, 2019, following a settlement mediation, CBL completely capitulated, settling the Racketeering Litigation charges for $90 million, which included the full claim amount of $60 million plus costs and attorney's fees.

16.     However, the Company's Schedule 14A filed with the SEC one week later on March 22, 2019 (the "2019 Proxy Statement") again failed to disclose the amount-in-controversy in the dispute, or that the parties had reached a settlement.

17.     Until March 26, 2019, the Individual Defendants continued to omit, or caused the Company to omit, material information about the amount of damages claimed in connection with the Racketeering Litigation, even when the settlement amount became fixed.

18.     After the close of trading on March 26, 2019, CBL announced the settlement of the Racketeering Litigation in a press release, attached as an exhibit to a Form 8-K filed with the SEC the same day. The press release again omitted the dollar amount of the settlement, though it was disclosed in the Form 8-K.

19.     Following this disclosure, CBL's price per share dropped $0.47 per share (about 25%) on a trading volume of 11.7 million shares, from a closing price of $1.91 on March 26, 2019 to close at $1.44 on March 27, 2019. CBL Series D preferred shares fell by $0.74 (7%), and CBL Series E preferred shares fell by $0.69 in two days.

20.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to engage in the Overcharge Misconduct and causing the Company to fail to maintain internal controls.

5

21.    In further breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements of material fact to the investing public regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company had engaged in the Overcharge Misconduct; (2) the Company was consequently subjected to a material legal proceeding (the Racketeering Litigation); (3) the Company was uninsured for any losses proceeding therefrom; and (4) the Company had failed to maintain internal controls.

22.    The Company's public statements in its SEC filings were materially false and misleading at all relevant times, and they caused an artificial inflation of CBL's stock price.

23.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

24.    Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Between November 8, 2017 and March 26, 2019, the Company repurchased 122,355 shares of its own stock for $4,53,943. As the Company's stock was actually only worth $1.00 per share, the price at which it was trading on April 25, 2019, the Company overpaid $331,588.

25.    In light of the Individual Defendants' misconduct, which has subjected the Company, the Company's Chief Executive Officer ("CEO"), its Chairman of the Board of Directors, its Executive Vice President, Chief Financial Officer, and Treasurer ("CFO"), and its Chairman of the Audit Committee to a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Tennessee (the "Securities Class Action"),

and subjected CBL to the Racketeering Litigation, the need to undertake internal investigations, the losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company and who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

26.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

27.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, of the substantial likelihood of the directors' liability in this derivative action and of certain of them in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of CBL's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b), 14(a), and 20(a) of the Exchange Act (15 U.S.C. §§ 78j, 78j, 78t, and SEC Rules 10b-5 and 14a-9 (17 C.F.R. § 240.10b-5, 240.14a-9) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

29.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

30.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

31.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

32.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation the headquarters of which is located in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

33.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

34.     Venue is proper in this District because CBL's headquarters are located in this District, CBL and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

35.     Plaintiff is a current shareholder of CBL common stock.  Plaintiff has continuously held CBL common stock since March 23, 2015.

### Nominal Defendant CBL

36.     Nominal Defendant CBL is a Delaware corporation with its headquarters at 2030 Hamilton Place Blvd., Suite 500 Chattanooga, TN 37421. CBL's shares of common stock, as well as its Series D and Series E preferred stock, all trade on the New York Stock Exchange ("NYSE") under the ticker symbol "CBL."

### Defendant S. Lebovitz

8

37.     Defendant Stephen D. Lebovitz ("S. Lebovitz") has served as the Company's CEO since January 1, 2010 and as a Company director since November 1993. He served as the President of the Company for a portion of the Relevant Period, from February 1999 to June 2018. He also serves as a member of the Executive Committee. According to the 2019 Proxy Statement, as of March 15, 2019 Defendant S. Lebovitz beneficially owned 832,154 shares (1.01%) of the Company's stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2019 was $1.81, Defendant S. Lebovitz beneficially owned over $1.5 million worth of CBL stock. Defendant S. Lebovitz is also the son of Charles B. Lebovitz ("C. Lebovitz").

38.     For the fiscal year ended December 31, 2018, Defendant S. Lebovitz received $3,472,388 in compensation from the Company. This included a base salary of $707,000 and stock awards worth $1,471,139.

39.     The 2019 Proxy Statement stated the following about Defendant S. Lebovitz:

Stephen D. Lebovitz serves as Chief Executive Officer of the Company, and also served as President of the Company prior to Michael I. Lebovitz being promoted to serve as President in June 2018. He previously served as President and Secretary of the Company from February 1999 to January 1, 2010, when he became President and Chief Executive Officer, and has served as a director of the Company since the completion of its initial public offering in November 1993. He also serves as a member of the Executive Committee of the Board of Directors. Since joining CBL's Predecessor in 1988, Mr. Lebovitz has also served as Executive Vice President – Development/Acquisitions, Executive Vice President – Development, Senior Vice President – New England Office, and as Senior Vice President – Community Center Development and Treasurer of the Company. Before joining CBL's Predecessor, Mr. Lebovitz was affiliated with Goldman, Sachs & Co. from 1984 to 1986.

Mr. Lebovitz served as Chairman of the ICSC from May 2015 through May 2016. He is a past Trustee and Divisional Vice President of the ICSC (2002-08), and is a former member of the Advisory Board of Governors of NAREIT. Mr. Lebovitz is a Trustee of Milton Academy, Milton, Massachusetts, a former member of the Board of Trust of Children's Hospital, Boston, and a past president of the Boston Jewish Family & Children's Service. He received the 2014 Edwin N. Sidman Leadership Award for his philanthropic contributions to Boston's Combined Jewish Philanthropies, including his service as a former Board member and annual campaign chair. Mr. Lebovitz holds a Bachelor's degree in Political Science from

Stanford University and a Master of Business Administration degree from Harvard University. Stephen D. Lebovitz is a son of Charles B. Lebovitz and a brother of Michael I. Lebovitz and Alan L. Lebovitz.

**Defendant C. Lebovitz**

40.     Defendant C. Lebovitz is the Company's Chairman of the Board and has been a Company director since 1993. He previously served as CBL's President from November 1993 until 1999, and as its CEO from November 1993 until 2010. He also serves as Chair of the Executive Committee. According to the 2019 Proxy Statement, as of March 15, 2019 Defendant C. Lebovitz beneficially owned 19,112,878 shares (10.4%) of the Company's stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2019 was $1.81, Defendant C. Lebovitz beneficially owned approximately $34.6 worth of CBL stock. Defendant C. Lebovitz is also the father of CEO Defendant S. Lebovitz.

41.     For the fiscal year ended December 31, 2018, Defendant C. Lebovitz received $2,540,247 in compensation from the Company. This included a base salary of $681,750 and stock awards worth $1,044,001.

42.     The 2019 Proxy Statement stated the following about Defendant C. Lebovitz:

Charles B. Lebovitz serves as Chairman of the Board of the Company and as Chairman of the Executive Committee of the Board of Directors. He previously served as Chief Executive Officer of the Company from the completion of its initial public offering in November 1993 until 2010, and also served as President of the Company until February 1999. Prior to the Company's formation, he served in a similar capacity with CBL's Predecessor. Mr. Lebovitz has been involved in shopping center development since 1961 when he joined his family's development business. In 1970, he became affiliated with Arlen Realty & Development Corp. ("Arlen") where he served as President of Arlen's shopping center division, and, in 1978, he founded CBL's Predecessor together with his associates.
Mr. Lebovitz is an Advisory Director of First Tennessee Bank, N.A., Chattanooga, Tennessee and a member of the Urban Land Institute. He is a past president of the B'nai Zion Congregation in Chattanooga, a member of the National Board of Directors of Maccabiah USA/Sports for Israel (Maccabiah Games), and a National Vice Chairman of the United Jewish Appeal. He was the Campaign Chair for the Jewish Federation of Greater Chattanooga in 1989 and served as President in 1990-

91. Mr. Lebovitz also has previously served as Chairman of the International Council of Shopping Centers, Inc. ("ICSC") and as a Trustee and Vice President (Southern Division) of the ICSC and is a former member of the Board of Governors of the National Association of Real Estate Investment Trusts ("NAREIT"). He is a former member of the Chancellor's Round Table for the University of Tennessee at Chattanooga, a Past President of the Alumni Council for The McCallie School, Chattanooga, and a past member of The McCallie School Board of Trustees, where he was named the recipient of the 1995 Distinguished Alumnus Award. He also is a past member of the Board of Trustees for Girls' Preparatory School in Chattanooga. Mr. Lebovitz received the 2015 Leadership Fundraiser of the Year Award from the Association of Fundraising Professionals in conjunction with National Philanthropy Day. Mr. Lebovitz received his Bachelor of Arts degree in Business from Vanderbilt University. He is the father of Company executive officers Stephen D. Lebovitz, Michael I. Lebovitz and Alan L. Lebovitz.

**Defendant Khaleel**

43. Defendant Farzana Khaleel ("Khaleel") has been the Company's Executive Vice President, Chief Financial Officer, and Treasurer since September 10, 2012. According to the 2019 Proxy Statement, as of March 15, 2019 Defendant Khaleel beneficially owned 318,371 shares of Company stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2019 was $1.81, Defendant Khaleel beneficially owned over $576,000 worth of CBL stock.

44. For the fiscal year ended December 31, 2018, Defendant Khaleel received $1,283,157 in compensation from the Company. This included, *inter alia*, a base salary of $534,279 and stock awards worth $417,600.

45. The 2019 Proxy Statement stated the following about Defendant Khaleel:

Farzana Khaleel serves as Executive Vice President – Chief Financial Officer and Treasurer of the Company. Ms. Khaleel served as Executive Vice President – Finance of the Company from January 2010 through September 10, 2012, when she was promoted to her current positions. Previously, Ms. Khaleel served as Senior Vice President – Finance of the Company from September 2000 through January 1, 2010. Prior to joining the Company, Ms. Khaleel was Vice President of Equitable Real Estate (successor to Lend Lease Real Estate Investments prior to its acquisition by Morgan Stanley). Ms. Khaleel served the Equitable and Lend Lease companies for 18 years in various senior financial positions and as Deputy Portfolio

11

Manager for Equitable/AXA Financial's mortgage portfolio. From 1976 to 1982, she served as Assistant Treasurer of IRT Property Company, a former REIT. Ms. Khaleel has served since October 2010 on the Board of Commissioners of the Chattanooga Metropolitan Airport Authority (CMA) and also is a member of the Finance Committee of the CMA. Ms. Khaleel received a Bachelor of Business Administration degree in Economics, a Master of Business Administration degree in Accounting and a Master of Science degree in Real Estate and Urban Affairs from Georgia State University. She is a certified public accountant, licensed in the state of Georgia.

**Defendant Bryenton**

46.     Defendant Gary L. Bryenton ("Bryenton") served as a Company director from 2001 until his retirement on December 31, 2018. Defendant Bryenton was a member of the Audit Committee during the Relevant Period.

47.     For the fiscal year ended December 31, 2018, Defendant Bryenton received $180,000 in compensation from the Company. This included a base salary of $80,000 and stock awards worth $100,000.

48.     CBL's Schedule 14A, filed with the SEC on March 29, 2018 (the "2018 Proxy Statement") stated the following about Defendant Bryenton:

Gary L. Bryenton joined the Company as a director on January 31, 2001, in accordance with the terms of the Company's acquisition of a portfolio of properties from Jacobs Realty Investors Limited Partnership, a Delaware limited partnership ("JRI"), and certain of its affiliates and partners (collectively referred to herein as the "Jacobs Group" and the acquisition is referred to herein as the "Jacobs Acquisition"). Mr. Bryenton is Chairman of the Nominating/Corporate Governance Committee and a member of the Audit Committee of the Company's Board of Directors.   Mr. Bryenton is a Senior Partner of the law firm of Baker & Hostetler LLP, where he counsels individual professionals and business entities in business, financial and tax planning as well as in structuring a variety of complex real estate, financing and merger and acquisition transactions, and has formerly served as the firm's Executive Partner and Chief Operating Officer. He currently is a member of the Board of Trustees of Heidelberg College and also is a former Trustee of the Rutherford B. Hayes Presidential Center. Mr. Bryenton received his Bachelor of Arts degree from Heidelberg College and a Doctor of Jurisprudence degree from Case Western Reserve University School of Law.

**Defendant Chapman**

12

49.     Defendant A. Larry Chapman ("Chapman") has been a Company director since August 16, 2013. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. According to the 2019 Proxy Statement, as of March 15, 2019 Defendant Chapman beneficially owned 84,397 shares of Company stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2019 was $1.81, Defendant Chapman beneficially owned approximately $153,000 worth of CBL stock.

50.     For the fiscal year ended December 31, 2018, Defendant Chapman received $180,000 in compensation from the Company. This included cash compensation of $80,000 and stock awards worth $100,000.

51.     The 2019 Proxy Statement stated the following about Defendant Chapman:

A. Larry Chapman joined the Company as a director on August 16, 2013. Mr. Chapman is Chairman of the Audit Committee and a member of the Compensation Committee of the Company's Board of Directors. Mr. Chapman is a retired 37-year veteran of Wells Fargo & Co., serving as an executive officer of the company from 1987 to 2011. He most recently served as Executive Vice President and the Head of Commercial Real Estate, and as a member of the Wells Fargo Management Committee, from 2006 until his retirement in June 2011. Mr. Chapman joined Wells Fargo in 1974 in its Houston Real Estate office. In 1987, he was promoted to President of Wells Fargo Realty Advisors, a wholly-owned subsidiary of Wells Fargo & Co. As the Group Head of Wells Fargo's Commercial Real Estate Lending business, Mr. Chapman was responsible for the group's 75 nationally located real estate loan production offices and 1,500 full time employees. At his retirement in 2011, Mr. Chapman managed the largest bank real estate lending portfolio in the United States, which totaled approximately $60 billion.

Mr. Chapman is a member of the Board of Directors of Realty Income Corporation, a triple net lease REIT, and also serves on its Audit and Technology Risk committees. He is a former board member of the Fisher Center for Real Estate and Urban Economics at the University of California, Berkeley; past governor, council member, and trustee of the Urban Land Institute; a past member of NAREIT; and a member and past trustee of the ICSC. Mr. Chapman previously was appointed by the Governor of California to serve on the board of the California Science Center Museum. He also spent six years on the Los Angeles Memorial Coliseum Commission, serving as President in 2002. Mr. Chapman received his Bachelor of Business degree in finance and banking from Texas Tech University.

**Defendant Dominski**

13

52.     Defendant Matthew S. Dominski ("Dominski") has been a Company director since February 2, 2005. He is also the Lead Independent Director, serving as the Chair of the Compensation Committee and as a member of the Audit Committee. According to the 2019 Proxy Statement, as of March 15, 2019 Defendant Dominski beneficially owned 93,276 shares of Company stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2019 was $1.81, Defendant Dominski beneficially owned approximately $169,000 worth of CBL stock.

53.     For the fiscal year ended December 31, 2018, Defendant Dominski received $205,000 in compensation from the Company. This included cash compensation of $105,000 and stock awards worth $100,000.

54.     The 2019 Proxy Statement stated the following about Defendant Dominski:

Matthew S. Dominski joined the Company as a director on February 2, 2005. Mr. Dominski serves as Lead Independent Director and is Chairman of the Compensation Committee and a member of the Audit Committee of the Company's Board of Directors. From 1993 through 2000, Mr. Dominski served as Chief Executive Officer of Urban Shopping Centers ("Urban"), formerly one of the largest regional mall property companies in the United States and a publicly traded REIT listed on the NYSE and the Chicago Exchange. Previously, he also served in various management positions at JMB Realty Corporation. Following the purchase of Urban by Rodamco North America in 2000, Mr. Dominski served as Urban's President until 2002.

Mr. Dominski operated, as a joint owner, Polaris Capital, LLC, a Chicago, Illinois based real estate investment firm, from 2003 through 2013. Mr. Dominski currently serves as a director of First Industrial Realty Trust, a NYSE-listed REIT which buys, sells, leases, develops and manages industrial real estate, and also serves on its Investment and Nominating/Corporate Governance Committees. From 1998 until 2004, Mr. Dominski served as a member of the Board of Trustees of the ICSC. Mr. Dominski received his Bachelor of Arts degree in Economics from Trinity College and a Master of Business Administration degree from the University of Chicago.

**Defendant Griffith**

14

55.     Defendant John D. Griffith ("Griffith") has been a Company director since January 7, 2015. He also serves as a member of the Compensation and Nominating/Corporate Governance Committees. According to the 2019 Proxy Statement, as of March 15, 2019 Defendant Griffith beneficially owned 83,382 shares of Company stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2019 was $1.81, Defendant Griffith beneficially owned approximately $151,000 worth of CBL stock.

56.     For the fiscal year ended December 31, 2018, Defendant Griffith received $170,000 in compensation from the Company. This included cash compensation of $70,000 and stock awards worth $100,000.

57.     The 2019 Proxy Statement stated the following about Defendant Griffith:

John D. Griffith joined the Company as a director on January 7, 2015. Mr. Griffith is a member of the Compensation and Nominating/Corporate Governance Committees of the Company's Board of Directors. In February 2019, Mr. Griffith was appointed as Senior Vice President of Real Estate and Development for Life Time, Inc., which operates a chain of health clubs in the United States and Canada. Mr. Griffith currently serves as Managing Partner of Griffith Real Estate LLC, a commercial real estate development firm. He also served as Head of Global Operations for the American Refugee Committee, an international organization dedicated to serving refugees in fragile states, from July 2016 through July 2018. Mr. Griffith retired from Target Corporation ("Target") in May 2014, having served most recently as Executive Vice President of Property Development from 2005 until his retirement, and as a member of Target's Executive Committee. He started with Target in 1999 as the Vice President of Construction. As the Executive Vice President of Property Development at Target, Mr. Griffith was responsible for the management of Target's real estate, consisting of over 300 million square feet valued at $30 billion, and had responsibility for 3,500 full time employees. During his time at Target, he doubled the retail footprint from approximately 900 locations to more than 1,900. Mr. Griffith served as the Governor's appointed Commissioner on the Minnesota Sports Facilities Authority to build a new NFL stadium for the Minnesota Vikings. He is a past trustee of the ICSC, having served on the Executive Committee, and also is a past trustee of Bethel University. Mr. Griffith holds a Bachelor of Arts degree in Business and Economics from Bethel College and a Master of Business Administration degree from the University of Minnesota, Carlson School of Management.

**Defendant Lieb**

15

58.     Defendant Richard J. Lieb ("Lieb") has been a Company director since February 10, 2016. He also serves as a member of the Audit and Nominating/Corporate Governance Committees. According to the 2019 Proxy Statement, as of March 15, 2019 Defendant Lieb beneficially owned 72,509 shares of Company stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2019 was $1.81, Defendant Lieb beneficially owned over $131,000 worth of CBL stock.

59.     For the fiscal year ended December 31, 2018, Defendant S. Lieb received $175,000 in compensation from the Company. This included cash compensation of $75,000 and stock awards worth $100,000.

60.     The 2019 Proxy Statement stated the following about Defendant Lieb:

Richard J. Lieb joined the Company as a director on February 10, 2016. Mr. Lieb is a member of the Audit and Nominating/Corporate Governance Committees of the Company's Board of Directors. As of January 1, 2019, Mr. Lieb currently serves as Senior Advisor at Greenhill & Co., LLC, a publicly traded independent investment banking firm he joined in 2005. From 2005 through 2018, Mr. Lieb was a Managing Director and also served as Chairman of Real Estate of Greenhill. He served as Greenhill's Chief Financial Officer from 2008 to 2012 and also served as a member of the firm's Management Committee from 2008 to 2015. Mr. Lieb has also served at various times during his tenure at Greenhill as head of the firm's Restructuring business and as head of North American Corporate Advisory services. Prior to joining Greenhill, Mr. Lieb spent more than 20 years with Goldman Sachs, where he headed that firm's Real Estate Investment Banking Department from 2000 to 2005. Overall, Mr. Lieb has more than 30 years of experience as a strategic advisor to participants in the real estate industry, spanning nearly all property sectors. Mr. Lieb is licensed with FINRA and holds Series 7/General Securities, Series 63 and Series 24 licenses. Mr. Lieb serves as a director, and as Chairman of the Audit Committee and a member of the Compensation Committee, of VEREIT, Inc., a REIT with a diversified portfolio of retail, restaurant, office and industrial real estate assets. Mr. Lieb also serves as a director and a member of the Audit Committee and the Compensation Committee of AvalonBay Communities, Inc., an apartment REIT.
Mr. Lieb is an active member of the American Jewish Committee (AJC) and has served as a member of Wesleyan University's Career Advisory Counsel. He holds a Bachelor of Arts degree from Wesleyan University and a Master of Business Administration degree from Harvard Business School.

**Defendant Nay**

61.     Defendant Gary J. Nay ("Nay") served as a Company director from 2011 until his retirement on December 31, 2018.

62.     For the fiscal year ended December 31, 2018, Defendant Nay received $170,000 in compensation from the Company. This included cash compensation of $70,000 and stock awards worth $100,000.

63.     The 2018 Proxy Statement stated the following about Defendant Nay:

Gary J. Nay joined the Company as a director upon his election at the 2011 Annual Meeting. Mr. Nay is a member of the Compensation and Nominating/Corporate Governance Committees of the Company's Board of Directors. He is the former Vice President of Real Estate of Macy's, Inc. and its predecessor, Federated Department Stores, a position he held from 1988 through his retirement in February 2010. As head of Real Estate at Federated/Macy's, Mr. Nay led the growth of the company's portfolio from 220 stores to 850 Macy's and Bloomingdale's stores across 45 states, Puerto Rico and Guam, generating more than $24 billion in sales. From 1980 to 1988, Mr. Nay served as Divisional Vice President of Real Estate for Mervyn's, then a subsidiary of Dayton Hudson Corporation, during which time he was responsible for Mervyn's expansion to the East Coast, opening 76 stores from Texas to Florida. Mr. Nay has served on the Board of Trustees of the ICSC, including positions on the Executive Committee and as former Dean of the School of Retailing for ICSC's University of Shopping Centers. He also previously served as a director of the Dan Beard Council of The Boy Scouts of America and has held positions on the Strategic Planning Committee and as past Co-Chairman of the Friends of Scouting campaign. During his career at Federated/Macy's, Mr. Nay chaired the annual United Way Campaign for Macy's corporate office and represented Macy's on the board of The Cincinnati New Markets Fund, a private organization of 13 leading Cincinnati corporations, providing loans and equity investments that have helped to revitalize the center city and adjacent Over-The-Rhine neighborhood in Cincinnati, Ohio. Mr. Nay holds a B.A. degree from the University of North Texas.

**Defendant Nelson**

64.     Defendant Kathleen M. Nelson ("Nelson") has been a Company director since May 5, 2009. She also serves as the Chair of the Nominating/Corporate Governance Committee and as a member of the Executive Committee. According to the 2019 Proxy Statement, as of March 15,

2019 Defendant Nelson beneficially owned 90,931 shares of Company stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2019 was $1.81, Defendant Nelson beneficially owned over $164,500 worth of CBL stock.

65.     For the fiscal year ended December 31, 2018, Defendant Nelson received $175,000 in compensation from the Company. This included a cash compensation of $75,000 and stock awards worth $100,000.

66.     The 2019 Proxy Statement stated the following about Defendant Nelson:

Kathleen M. Nelson joined the Company as a director on May 5, 2009. Ms. Nelson is Chairman of the Nominating/Corporate Governance Committee and a member of the Executive Committee of the Company's Board of Directors. She has an extensive background in commercial real estate and financial services with over 40 years of experience, including 36 years at TIAA-CREF. Ms. Nelson held the position of Managing Director/Group Leader and Chief Administrative Officer for TIAA-CREF's Mortgage and Real Estate Division. TIAA-CREF's mortgage and real estate portfolio totaled over $53.0 billion and was invested in all sectors of real estate, of which approximately 25% was invested in retail. Ms. Nelson developed and staffed TIAA-CREF's Real Estate Research Department and created the pre-eminent commercial mortgage loan sales model for TIAA-CREF, generating over $10.0 billion in mortgage sales. She retired from this position in 2004 and currently serves as President and Founder of KMN Associates LLC (KMN), a commercial real estate investment advisory and consulting firm which advises clients in a variety of commercial real estate transactions including portfolio strategy and capital sourcing. In 2009, Ms. Nelson co-founded and currently serves as Managing Principal of Bay Hollow Associates, LLC, a commercial real estate consulting firm, which provides counsel to institutional investors.Ms. Nelson has previously served as Chairman of the ICSC, has been an ICSC Trustee since 1991, and served as the Treasurer and Chairman for the 1996 ICSC Annual Convention. She is the Chairman of the ICSC Audit Committee and is a member of various other ICSC committees. Ms. Nelson is a director, Chairman of the Nominating and Corporate Governance Committee and a member of the Audit, Compensation and Human Resources, and Redevelopment and Construction Committees, of Apartment Investment and Management Company (AIMCO), a publicly held REIT that owns and manages multi-family residential properties. Ms. Nelson also serves as Lead Director, and as a member of the Compensation and Human Resources, Executive, Risk, and Strategic Planning Committees, of Dime Community Bancshares, Inc., a publicly traded bank holding company based in Brooklyn, New York. She also serves as an unaffiliated Director of the J.P. Morgan U.S. Real Estate Income & Growth Fund and on the Castagna Realty Company Advisory Board, the Beverly Willis Architectural Foundation Advisory Board and is a member of the Anglo

18

American Real Property Institute. She has served on the Board of Advisors to the Rand Institute Center for Terrorism Risk Management Policy. Ms. Nelson is a graduate of Indiana University with a Bachelor of Science degree in Real Estate, the University of Chicago Executive Management Program, and the Aspen Institute Leadership Seminar.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

67.     By reason of their positions as officers, directors, and/or fiduciaries of CBL and because of their ability to control the business and corporate affairs of CBL, the Individual Defendants owed CBL and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage CBL in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of CBL and its shareholders so as to benefit all shareholders equally.

68.     Each director and officer of the Company owes to CBL and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

69.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of CBL, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

70.     To discharge their duties, the officers and directors of CBL were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

71.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The

19

conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CBL, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised CBL's Board at all relevant times.

72.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose material facts it omitted in its regulatory filings with the SEC and communications with shareholders, including that CBL was involved in a large class action lawsuit, so that the market price of the Company's common stock would be based upon truthful and accurate information. Additionally, the Individual Defendants had a duty not to cause CBL to waste corporate assets by making the Company repurchase its own stock at artificially inflated prices, to the detriment of CBL and its shareholders.

73.     To discharge their duties, the officers and directors of CBL were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of CBL were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Tennessee, the United States, and pursuant to CBL's own Code of Business Conduct and Ethics, Guidelines on Corporate Governance, and internal guidelines;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how CBL conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of CBL and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that CBL's operations would comply with all laws and CBL's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

74.     Each of the Individual Defendants further owed to CBL and the shareholders the duty of loyalty requiring that each favor CBL's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

75.     At all times relevant hereto, the Individual Defendants were the agents of each other and of CBL and were at all times acting within the course and scope of such agency.

76.     Because of their advisory, executive, managerial, and directorial positions with CBL, each of the Individual Defendants had access to adverse, non-public information about the Company.

77.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by CBL.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

78.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

22

79.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) to conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) to cause an artificial inflation in the Company's stock price.

80.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are or were directors of CBL during the Relevant Period was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

81.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

82.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of CBL, and was at all times acting within the course and scope of such agency.

23

## <u>CODE OF CONDUCT</u>

83.     Pursuant to the Company's Code of Business Conduct and Ethics (the "Code of Conduct"), updated on August 9, 2018, all the Company's officers, directors, and employees must conform their conduct to the provisions of the Code of Conduct.

84.     The Introduction to the Code of Conduct provides, in relevant part, that:

CBL & Associates Properties, Inc., CBL & Associates Limited Partnership and CBL & Associates Management, Inc. and each of their respective subsidiaries and affiliates (hereinafter referred to collectively as the "Company") expect that directors, officers and employees will conduct themselves ethically and properly as a matter of course and comply with the guidelines set forth below.

[The Code of Conduct] exists (i) to provide an official statement as to how the Company conducts itself internally and in the marketplace, (ii) to set forth certain standards that the Company shall require of its directors, officers and employees in relation to fellow employees, and (iii) to set forth certain standards that the Company shall require of its directors, officers and employees in relation to the Company's tenants, vendors, contractors, competitors, government and regulatory agencies and officials, potential or actual joint venture partners, third party consultants, lenders, investors, the public, the media and anyone else with whom the Company may conduct business.

This Code is intended to comply with the requirements of the Sarbanes-Oxley Act of 2002 and the rules of the New York Stock Exchange…

85.     The Code of Conduct describes its "Purpose" thus:

This Code is intended to provide a codification of standards that is reasonably designed to deter wrongdoing and to promote the following:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
- ***Full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission ("SEC")*** and in press releases, presentations and other public communications made by the Company;
- Compliance with applicable governmental laws, rules and regulations;
- The prompt internal reporting to an appropriate person or persons identified in this Code for violations of this Code; and
- Accountability for adherence to this Code

(Emphasis added).

24

86.     The Code of Conduct provides, as to "Policy Provisions," that: "[u]nder this Code, all employees are expected to conduct themselves in the full spirit of honest and lawful behavior, and no employee shall cause another employee or non-employee to act otherwise, either through inducement, coercion or any other measure."

87.     The Code of Conduct's "Fair Dealing" section stresses transparency and honesty in CBL's business dealings, stating that: "[e]ach employee should endeavor to deal fairly with the Company's customers, suppliers, competitors and other employees. ***An employee should not take an unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice***" (emphasis added).

88.     As to bookkeeping, the Code of Conduct provides, in its "Books and Records" section, that:

> ***False, misleading or artificial entries shall not be made in any reports, ledgers, books or records of the Company for any reason nor shall any misrepresentation be made regarding the content thereof***. Such entry or representation may result in criminal and/or civil penalties to the Company and/or the employee. No employee may engage in an arrangement that in any way may be interpreted or construed as misstating or otherwise concealing the nature or purpose of any entries in the books and records of the Company. No payment or receipt on behalf of the Company may be approved or made with the intention or understanding that any part of the payment or receipt is to be used for a purpose other than that described in the documents supporting the transaction. "Slush funds" or similar funds or accounts where no accounting for receipts or expenditures is made on the Company's books are strictly prohibited.

(Emphasis added).

89.     The Code of Conduct provides, as to "Compliance with Laws, Rules and Regulations," that: "[t]he Company proactively promotes the full compliance by all employees of applicable laws, rules and regulations of any governmental unit, agency or divisions thereof and

the rules and regulations of the NYSE and/or any exchange upon which the Company's stock may be traded."

90.     In describing the procedure by which employees should make disclosures, the Code of Conduct provides that:

> An employee who becomes aware of Alleged Wrongful Conduct is encouraged to make a disclosure to any Designated Company Officer or Director or to the Company's Audit Committee as soon as possible, but in any case, the employee must make the disclosure no later than 365 consecutive calendar days after becoming aware of the Alleged Wrongful Conduct. In order to allow the Company an opportunity to investigate Alleged Wrongful Conduct and to take necessary internal corrective action, employees are encouraged to report in writing a disclosure of Alleged Wrongful Conduct to a Designated Company Officer or Director or to the Company's Audit Committee. Alternatively, employees may utilize the mechanisms outlined in the Ethics Hotline Policy attached as Exhibit B to this Code to make such concerns known or submit concerns that may include misconduct of any type to include Alleged Wrongful Conduct or other inappropriate behavior under the Company's Policies & Procedures.

91.     The Code of Conduct again highlights the importance of full compliance with SEC and other regulations in its section titled "Public Company Reporting," stating, in relevant part:

> ***As a public company, it is of critical importance that the Company's filings with the SEC, the NYSE and other public disclosures of information be complete, fair, accurate, timely*** and understandable. An employee, officer or director of the Company may be called upon to provide necessary information to ensure that the Company's public reports are complete, fair, accurate and understandable. The Company expects each employee, officer and director to take this responsibility very seriously and to provide prompt, complete, fair, accurate and understandable responses to inquiries with respect to the Company's public disclosure requirements. With respect to the Company's employees, officers and directors who may be participating in the preparation of reports, information, press releases, forms or other information to be publicly disclosed through filings with the SEC or as mandated by the SEC or NYSE, such employees, officers and directors are expected to use their diligent efforts to ensure that such reports, press releases, forms or other information are complete, fair, accurate, timely and understandable.

(Emphasis added).

92.     Finally, the Code of Conduct emphasizes the importance of full abidance with its own provisions in its "Compliance and Discipline" section, stating that:

26

All employees of the Company are required to fully comply with this Code. Employees are expected to report violations of this Code and assist the Company, when necessary, in investigating violations. All department heads, managers and supervisors are charged with the responsibility of supervising their employees in accordance with this Code. Failure to comply with this Code will result in disciplinary action that may include suspension, termination, referral for criminal prosecution and/or reimbursement to the Company for any losses or damages resulting from the violation. The Company reserves the right to immediately terminate any employee for a single violation of this Code.

93.     In violation of the Code of Conduct, the Individual Defendants, as key officers and members of the Company's Board, conducted little, if any, oversight of the Company's engagement in the Overcharge Misconduct, of its internal controls of public reporting of financial statements, or of the Individual Defendants' schemes to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment. In violation of the Code of Conduct, the Individual Defendants consciously disregarded their duties to (1) comply with the applicable laws and regulations; (2) conduct themselves ethically and properly; (3) protect corporate assets; (4) engage in fair dealing; (5) report violations of the Code of Conduct; (6) appropriately maintain the Company's books, records, accounts, and financial statements; and (7) make accurate filings with the SEC.

## GUIDELINES ON CORPORATE GOVERNANCE

94.     Pursuant to the Company's Guidelines on Corporate Governance (the "Corporate Guidelines"), the entire Board is subject to the corporate governance practices contained therein.

95.     In reference to "Director Responsibilities," the Corporate Guidelines provide that:

The business and affairs of the Company shall be managed under the direction of the Board. The basic responsibility of the Board is to exercise business judgment to promote the best interests of the Company and its shareholders in terms of corporate governance, fiduciary responsibilities, compliance with applicable laws and regulations, and the maintenance of accounting, financial, disclosure and other controls and optimizing shareholder value over the long term…

96.     The Corporate Guidelines provides, as to "CEO Performance and Evaluation," that: "[a]s set forth in its Charter, the Compensation Committee will annually review corporate goals and objectives relevant to the compensation of the CEO, evaluate the performance of the CEO in light of such goals and objectives, and determine the compensation of the CEO based upon such evaluation."

97.     In violation of the Corporate Guidelines, the Individual Defendants who are members of the Board conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the Individual Defendants' schemes to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Sections 10(b), 14(a), and 20(a) of the Exchange Act. In violation of the Corporate Guidelines, the Individual Defendants who were and are members of the Board consciously disregarded their duties of loyalty, ethics, and to act in the best interests of the Company.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

98.     CBL owns, develops, acquires, leases, manages, and operates regional shopping malls, open-air and mixed-use centers, outlet centers, associated centers, community centers and office properties.

99.     CBL is a REIT and is the 100% owner of two qualified REIT subsidiaries, CBL Holdings I, Inc. ("Holdings I") and CBL Holdings II, Inc. ("Holdings II").

100.     As of December 31, 2018, Holdings I, the sole general partner of the Operating Partnership, owned a 1.0% general partner interest in the Operating Partnership and Holdings II, owned an 85.6% limited partner interest for a combined interest held by the Company of 86.6%.

101.     As the sole general partner of the Operating Partnership, the Company's subsidiary, Holdings I, has exclusive control of the Operating Partnership's activities. Management operates the Company and the Operating Partnership as one business. The management of the Company consists of the same individuals that manage the Operating Partnership, and the Company's only material asset is its indirect ownership of partnership interests of the Operating Partnership. As a result, the Company conducts substantially all its business through the Operating Partnership as described above. The Company also issues public equity from time to time and guarantees certain debt of the Operating Partnership. The Operating Partnership holds all the assets and indebtedness of the Company and, through affiliates, retains the ownership interests in the Company's joint ventures. Except for the net proceeds of offerings of equity by the Company, which are contributed to the Operating Partnership in exchange for partnership units on a one-for-one basis, the Operating Partnership generates all remaining capital required by the Company's business through its operations and its incurrence of indebtedness.

102.     Thus, CBL and the Operating Partnership have, throughout the Relevant Period, combined their periodic reports with the SEC into a single document for each period. Accordingly, any false or misleading statements made by CBL in its SEC filings, referred to herein as being made by CBL or the Company, were also made by the Operating Partnership.

103.     Moreover, the Operating Partnership conducts CBL's property management and development activities through CBL & Associates Management, Inc. to comply with certain requirements of the Internal Revenue Code of 1986, as amended.

104. Leases with retail tenants, like those at issue in the Racketeering Litigation, provide CBL with its primary source of revenue.

**The Overcharge Misconduct**

105. In 2016, prior to the Relevant Period, a number CBL's Florida tenants initiated the Racketeering Litigation against the Company.

106. The Racketeering Litigation accused CBL of utilizing rental agreements as an unlawful means to extract extra funds from its tenants, the first amended complaint in the Racketeering Litigation filed on July 1, 2016 (the "Racketeering Complaint") stated, in relevant part:

> When a landlord rents mall space to small businesses, it must follow state laws and regulations that forbid turning providing utilities into a profit center for secret excess rent. Likewise, when a mall landlord promises a tenant in written contract that it will not mark-up electricity, it must honor that contractual obligation. But CBL & Associates Properties, Inc. ("CBL"), broke these basic rules. Through a pernicious shell game of corporate entities, CBL for years executed a fraudulent scheme through a criminal enterprise to overcharge small business tenants for electricity at all of its shopping malls throughout the United States.

107. Specifically, the Company imposed a system of overbilling by directing and requiring its management to use lease agreements containing clauses that stated that tenants would be charged the same amount that the malls were charged by local utility providers. However, in spite of these contractual representations, the Company would inflate tenants' electric bills, sometimes by over 100% of the tenants' actual utility usage.[3] These unlawful electricity overcharges were then deliberately concealed by an audit waiver provision also included in the Company's leases. According to the Racketeering Complaint, the lease agreements required tenants to:

> …waive their right to audit the shopping malls' electric bills in exchange for agreeing that the electricity charges would not be marked-up. Whenever tenants

---

[3] *See* Racketeering Complaint, ¶ 3.

30

raised issues about their electricity costs, CBL caused CBL Management to inform the tenants that they had waived their audit rights under the lease agreement and instructed CBL Management not to provide the tenants with the actual electricity bills from the utilities, which would have revealed the undisclosed mark-ups.

108.    According to the Racketeering Complaint:

CBL's scheme allowed it to take advantage of the tenants by: (a) fraudulently misrepresenting to such tenants that their electricity charges were not being marked up; (b) actually marking-up the electrical charges in violation of the lease agreement; and (c) covering up that illegal conduct by using the audit waiver provision to shield it from scrutiny. CBL knew it was much bigger, and much better financed than the thousands of small business owners nationwide who rented mall spaces from it. In exploiting this inequality, CBL used its vast resources and superior negotiating and bargaining power to actively victimize and defraud tenants – simply to reap unfair, improper, and illegal profits.

109.    Nearly all the Racketeering Complaint's claims survived CBL's motion to dismiss, including a federal RICO claim[4] with treble damages; District Court Judge Sheri Polster Chappell specifically found that "[t]he insertion of the lease language, subsequent overcharging for electricity, and sharing of profits from the electrical cost inflation are enough to infer an agreement to participate in the conspiracy."[5] Two state law claims for Florida class members also remained: unjust enrichment and deceptive trade practices (FDUTPA).

110.    Soon after the Racketeering Litigation was brought, Catlin, CBL's insurance carrier, filed a lawsuit in Delaware state court to disclaim coverage. Catlin's suit was successful, and it obtained a declaratory judgment on September 20, 2017 in the Superior Court of Delaware. Judge Paul Wallace held that Catlin was not obligated to defend the Company in connection with the Racketeering Litigation, as the allegations in the Racketeering Litigation all sounded in intentional conduct, which was not covered under the insurance policy.[6] Thus, because CBL's

---

[4] The use of the mails and telecommunication to transmit the fraudulently marked-up electric bills brought the Racketeering Litigation under the purview of RICO.
[5] *See* Opinion and Order on Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint filed on April 11, 2017.
[6] *Catlin Specialty Ins. Co. v. CBL & Assocs. Props.,* No. N16C-07-166 PRW CCLD, 2017 Del. Super. LEXIS 471 (Super. Ct. Sep. 20, 2017).

policy had not covered intentional wrongdoing, the Company was left exposed to massive amounts of liability, for which it was knowingly uninsured as early as September 2017.

**False and Misleading Statements During the Relevant Period**

*November 8, 2017 Form 10-Q*

111.    The Relevant Period begins on November 8, 2017, when the Company filed its quarterly report for the three-month period ended September 30, 2017 on a Form 10-Q with the SEC (the "3Q17"). This was the first SEC quarterly report after CBL was formally denied insurance coverage for the pending Racketeering Litigation, which had also already survived a motion to dismiss on April 11, 2017. The 3Q17 was signed by Defendant Khaleel.

112.    The 3Q17 failed to acknowledge the existence or insurance status of the Racketeering Litigation, stating that the Company was "currently involved in certain litigation that arises in the ordinary course of business, ***most of which is expected to be covered by liability insurance***. Based on current expectations, such matters, both individually and in the aggregate, are ***not expected to have a material adverse effect on [CBL's] liquidity, results of operations, business or financial condition*** []" (emphasis added).

113.    Attached to the 3Q17 were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants S. Lebovitz and Khaleel attesting to the accuracy of the 3Q17.

*March 1, 2018 Form 10-K*

114.    On March 1, 2018, the Company filed its annual report for the fiscal year ended December 31, 2017 on a Form 10-K with the SEC (the "2017 10-K"), which was signed by Defendants C. Lebovitz, S. Lebovitz, Khaleel, Bryenton, Chapman, Dominski, Griffith, Lieb, Nay, and Nelson.

115. The 2017 10-K also once again downplayed the pending Racketeering Litigation, repeating verbatim the brief reassurances contained in the 3Q17 above. The name, materiality, and lack of insurance coverage of the suit were not discussed.

116. Attached to the 2017 10-K were SOX certifications signed by Defendants C. Lebovitz, S. Lebovitz and Khaleel attesting to the accuracy of the 2017 10-K.

**March 29, 2018 Proxy Statement**

117. On March 29, 2018, the Company filed its 2018 Proxy Statement, which was solicited by Defendants S. Lebovitz, C. Lebovitz, Bryenton, Chapman, Dominski, Griffith, Lieb, Nay, and Nelson. The 2018 Proxy Statement was filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[7]

118. In reference to the Code of Conduct, the 2018 Proxy Statement stated:

Our Board has adopted a Second Amended and Restated Code of Business Conduct and Ethics (the "Code of Business Conduct") that applies to all directors, officers and employees, including the Company's principal executive officer, principal financial officer and principal accounting officer. The Code of Business Conduct is available in the "Invest – Investor Relations – Governance Documents" section of the Company's website at cblproperties.com… The purpose of the Code of Business Conduct is to provide a codification of standards that is reasonably designed to deter wrongdoing and to promote accountability for and adherence to the standards of the Code, including honest and ethical conduct; the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; full, fair, accurate, timely and understandable disclosure in the Company's filings with the SEC and in other public communications by the Company; and compliance with all applicable rules and regulations that apply to the Company and to its directors, officers and employees.

---

[7] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

33

119.    Regarding Board and Management Roles in Risk Oversight, the 2018 Proxy Statement emphasized the responsibility shared by the entire Board, rather than just the Audit Committee, providing that:

> Assessing and managing risk is the responsibility of the management of our Company. ***Our Board is responsible for overseeing our risk management***. The Board administers its risk oversight function through (1) the review and discussion of regular periodic reports to the Board and its committees on topics relating to the risks that the Company faces, including, among others, market conditions, tenant concentrations and credit worthiness, leasing activity, the status of current and anticipated development projects, compliance with debt covenants, management of debt maturities, access to debt and equity capital markets, cyber-security risks and threat mitigation related to our technology and information systems, ***existing and potential legal claims against the Company*** and various other matters relating to the Company's business; (2) the required approval by the Board of Directors (or a committee thereof) of significant transactions that entail the expenditure of funds or incurrence of debt or liability in amounts in excess of certain threshold dollar amounts; (3) the review and discussion of regular periodic reports to the Board and its committees from the Company's independent registered public accountants regarding various areas of potential risk, including, among others, those relating to the qualification of the Company as a REIT for tax purposes; and (4) the direct oversight of specific areas of the Company's business by the Compensation, Audit and Nominating/Corporate Governance Committees.
>
> In addition, under its charter, the ***Audit Committee is specifically responsible for reviewing and discussing management's policies with respect to risk assessment and risk management***. The Company's Director of Internal Audit meets regularly in executive sessions with the Audit Committee (at least quarterly and more frequently if necessary), for discussions of the Company's oversight of risk through the internal audit function, including an annual review of the Company's internal audit plan, which is focused on significant areas of financial, operating, and compliance risk, and periodic updates on the results of completed internal audits of these significant areas of risk. ***The Audit Committee also monitors the Company's SEC disclosure compliance, and any related reporting risks***, and receives regular reports from the Company's Compliance Committee which assist the Audit Committee in exercising certain oversight responsibilities concerning (i) the Company's use of interest rate hedging instruments to manage our exposure to interest rate risk (including but not limited to entering swaps for such purpose and the exemption of any such swaps from applicable execution and clearing requirements) and (ii) compliance with the Company's Related Party Transactions Policy as described herein under the section entitled "Certain Relationships and Related Person Transactions.

(Emphasis added).

120.     The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

121.     The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including cash and equity awards designed to: "align our senior executives' long-term interests with those of our stockholders and serve as a disincentive to behavior that is focused only on the short-term and risks material harm to the Company," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

122.     The 2018 Proxy Statement also failed to disclose, *inter alia*: (1) that the Company had engaged in the Overcharge Misconduct; (2) that the Company faced a significant, non-routine lawsuit; (3) the substance of the claims against the Company; (4) the approximate amount of damages claimed; (5) the lack of insurance coverage for the potential loss; and (6) that the Company failed to maintain internal controls. Due to the foregoing, the Company's statements regarding its business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### *May 10, 2018 Form 10-Q*

123.     On May 10, 2018, the Company filed its quarterly report for the three-month period ended March 31, 2018 on a Form 10-Q with the SEC ("1Q18"), which was signed by Defendant Khaleel.

124. The 1Q18 repeated the assurances of the 3Q17 above, dismissing all pending litigation as immaterial and routine. The name, materiality, and lack of insurance coverage of the suit still were not disclosed.

125. Attached to the 1Q18 were SOX certifications signed by Defendants S. Lebovitz and Khaleel attesting to the accuracy of the 1Q18.

### August 9, 2018 Form 10-Q

126. On August 9, 2018, the Company filed its quarterly report for the three-month period ended June 30, 2018 on a Form 10-Q with the SEC ("2Q18"), which was signed by Defendant Khaleel.

127. The 2Q18 represented the statements contained in the 3Q17 above, continuing to downplay the litigation pending against CBL. The name, materiality, and lack of insurance coverage of the suit were once again not discussed.

128. Attached to the 2Q18 were SOX certifications signed by Defendants S. Lebovitz and Khaleel attesting to the accuracy of the 2Q18.

### November 9, 2018 Form 10-Q

129. On November 9, 2018, the Company filed its quarterly report for the three-month period ended September 30, 2018 on a Form 10-Q with the SEC ("3Q18"), which was signed by Defendant Khaleel.

130. The 3Q18 repeated the assurances from the 3Q17 one final time, using sweeping generalizations to minimize the unnamed litigation against the Company and claiming that insurance would cover most potential losses therefrom.

131. Attached to the 3Q18 were SOX certifications signed by Defendants S. Lebovitz and Khaleel attesting to the accuracy of the 3Q18.

132. The statements in ¶¶ 111-116 and 123-131 were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*: (1) that the Company had engaged in the Overcharge Misconduct; (2) that the Company was subsequently facing a significant, non-routine lawsuit; (3) the substance of the claims against the Company; (4) the approximate amount claimed, if determinable; (5) the lack of insurance coverage for the potential loss; and (6) that the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

## The Truth Begins to Emerge

### *March 1, 2019 Form 10-K*

133. On March 1, 2019, the Company filed its annual report for the fiscal year ended December 31, 2018 on a Form 10-K with the SEC (the "2018 10-K"), which was signed by Defendants C. Lebovitz, S. Lebovitz, Khaleel, Chapman, Dominski, Griffith, Lieb, and Nelson.

134. By this point, the Racketeering Litigation had progressed considerably. In January 2019, a RICO and FDUTPA class had been certified, and CBL's motion for summary judgment had been denied. Both of these developments confirmed that the Racketeering Litigation had merit and that it could materially affect CBL's finances.

135. In the 2018 10-K, the Company finally acknowledged the existence of the Racketeering Litigation and its lack of insurance coverage for potential losses in connection thereto. However, CBL maintained its innocence and downplayed the risk of significant loss, refusing to set aside any accrual in preparation for an adverse judgment. The 2018 10-K stated, in relevant part:

On March 16, 2016, Wave Lengths Hair Salons of Florida, Inc. d/b/a Salon Adrian filed a putative class action in the United States District Court for the Middle District of Florida (the "Court") for unspecified monetary damages as well as costs and attorneys' fees, based on allegations that the Company and certain affiliated entities overcharged tenants at bulk metered malls for electricity. On January 7, 2019, the Court partially granted the plaintiff's motion for class certification of a nationwide RICO class and a Florida RICO and FDUTPA class. ***We believe this lawsuit is without merit and are defending ourselves vigorously***. On January 22, 2019, we filed a petition seeking interlocutory review of the Court's class certification order; that petition is still pending as of the date of this report. On January 23, 2019, the Court set this matter for the trial term starting on April 1, 2019. ***We have not recorded an accrual relating to this matter at this time as a loss has not been determined to be probable. Further, we do not have sufficient information to reasonably estimate the amount or range of reasonably possible loss at this time.*** However, litigation is uncertain and an adverse judgment in this case could have a material adverse effect on our financial condition and results of operations. This matter is not covered by insurance.

(Emphasis added).

136.     Attached to the 2018 10-K were SOX certifications signed by Defendants S. Lebovitz and Khaleel attesting to the accuracy of the 2018 10-K.

137.     Though the Racketeering Litigation did not initially seek a specific amount in damages, CBL was aware that it faced many millions of dollars of liability in this suit, and it should have disclosed as much in its financial statements. This is supported by the fact that the 2018 10-K was filed only two weeks before CBL completely capitulated in a scheduled mediation session. Given that on the date of the 2018 10-K filing, March 1, 2019, a costly trial was scheduled for only one month away, it is highly unlikely that the Company was completely ignorant of the approximate amount of risk it faced.

138.     The statements in ¶¶ 133-136 were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false or misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*: (1) the approximate magnitude of the financial risk of the lawsuit; and (2) that the Company failed to maintain internal controls.

Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### *March 22, 2019 Proxy Statement*

139.   On March 22, 2019, the Company filed its 2019 Proxy Statement with the SEC which was solicited by Defendants C. Lebovitz, S. Lebovitz, Chapman, Dominski, Griffith, Lieb, and Nelson. The 2019 Proxy Statement was filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[8]

140.   The 2019 Proxy Statement was filed a full week after CBL had capitulated in mediation with the Racketeering Litigation plaintiffs on March 14, 2019, the next day agreeing to a $90 million settlement.

141.   In reference to CBL's Code of Conduct, the 2019 Proxy Statement echoed its previous description of its policies, stating:

> Our Board has adopted a Third Amended and Restated Code of Business Conduct and Ethics (the "Code of Business Conduct") that applies to all directors, officers and employees, including the Company's principal executive officer, principal financial officer and principal accounting officer. The Code of Business Conduct is available in the "Invest – Investor Relations – Governance Documents" section of the Company's website at cblproperties.com, or at no charge by directing a written request for a copy… The purpose of the Code of Business Conduct is to provide a codification of standards that is reasonably designed to deter wrongdoing and to promote accountability for and adherence to the standards of the Code, including honest and ethical conduct; the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; full, fair, accurate, timely and understandable disclosure in the Company's filings with the SEC and in other public communications by the Company; and compliance with all applicable rules and regulations that apply to the Company and to its directors, officers and employees.

---

[8] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

142. The section about the risk management responsibilities of the Board and the Audit Committee also reiterated prior disclosures, with the 2019 Proxy Statement stating, in relevant part:

> Our Board is responsible for overseeing our risk management. The Board administers its risk oversight function through (1) the review and discussion of regular periodic reports to the Board and its committees on topics relating to the risks that the Company faces, including, among others, market conditions, tenant concentrations and credit worthiness, leasing activity, the status of current and anticipated development projects, compliance with debt covenants, management of debt maturities, access to debt and equity capital markets, cyber-security risks and threat mitigation related to our technology and information systems, existing and potential legal claims against the Company and various other matters relating to the Company's business; (2) the required approval by the Board of Directors (or a committee thereof) of significant transactions that entail the expenditure of funds or incurrence of debt or liability in amounts in excess of certain threshold dollar amounts; (3) the review and discussion of regular periodic reports to the Board and its committees from the Company's independent registered public accountants regarding various areas of potential risk… (4) the direct oversight of specific areas of the Company's business by the Compensation, Audit and Nominating/Corporate Governance Committees. In addition, under its charter, the Audit Committee is specifically responsible for reviewing and discussing management's policies with respect to risk assessment and risk management. The Company's Director of Internal Audit meets regularly in executive sessions with the Audit Committee (at least quarterly and more frequently if necessary), for discussions of the Company's oversight of risk through the internal audit function, including an annual review of the Company's internal audit plan, which is focused on significant areas of financial, operating, and compliance risk, and periodic updates on the results of completed internal audits of these significant areas of risk. The Audit Committee also monitors the Company's SEC disclosure compliance, and any related reporting risks, and receives regular reports from the Company's Compliance Committee which assist the Audit Committee in exercising certain oversight responsibilities…

143. The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

144. The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-

40

performance" elements, including cash and equity awards designed to: "align our senior executives' long-term interests with those of our stockholders and serve as a disincentive to behavior that is focused only on the short-term and risks material harm to the Company," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

145.     The 2019 Proxy Statement also failed to disclose, *inter alia*: (1) that the Racketeering Litigation had been settled; (2) the amount of the settlement fund; and (3) that the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

## **The Truth Fully Emerges**

### *March 26, 2019 Press Release and Form 8-K*

146.     On March 26, 2019 the Company issued a press release to discuss the settlement of the Racketeering Litigation (the "March 2019 Press Release"). The March 2019 Press Release was attached as an exhibit to CBL's Form 8-K (the "March 2019 8-K") filed with the SEC that same day.

147.     The March 2019 Press Release, despite explaining the litigation and its settlement, failed to disclose the total amount to be paid by CBL, stating, in relevant part:

> **Background**
> On March 16, 2016, Wave Lengths Hair Salons of Florida, Inc. d/b/a Salon Adrian filed a putative class action in the United States Court for the Middle District of Florida seeking unspecified monetary damages, as well as costs and attorneys' fees, based on allegations that CBL and certain affiliated entities overcharged tenants at bulk metered malls for electricity.
> In recent months, the pace of the case accelerated to a considerable degree. On January 7, 2019, the Court partially granted the plaintiff's motion for class certification of a nationwide RICO class and a Florida RICO and FDUTPA class. On January 22, 2019, CBL filed a petition with the United States Court of Appeals

41

for the Eleventh Circuit seeking permission to appeal the Court's class certification order, and on March 4, 2019, that petition was denied. On March 11, 2019, the Court set the trial date for April 2, 2019. On March 15, 2019, following mediation proceedings, a proposed structure of a settlement was approved by representatives of the parties.

CBL denies all allegations of wrongdoing and asserts that its actions have at all times been lawful and proper. However, given the class certification, the accelerated trial schedule, the inherent risk of any trial, and the potential cost of an adverse resolution of the litigation, the Company believes that mediation was the prudent path. Furthermore, it maintains that the proposed settlement is in CBL's best interest and in the best interests of its shareholders.

**Proposed Settlement Structure**

Details of the proposed settlement structure and anticipated accounting impact are available on CBL's Form 8-K filed with the SEC today.

As part of the proposed settlement, CBL will suspend payment of its common dividend for two quarters: the quarter ended June 30, 2019 (payable in third quarter 2019), and the quarter ended September 30, 2019 (payable in fourth quarter 2019). The suspension of the dividend for two quarters will preserve approximately $26.0 million in cash at the current quarterly dividend rate. Based on the current projection of taxable income for 2019, which includes the impact of the settlement, CBL believes it will satisfy all required REIT distributions for the 2019 taxable year. The proposed settlement does not restrict CBL's payment of common dividends thereafter. CBL anticipates resuming a quarterly distribution with its dividend payable in January 2020 (subject to Board approval) in an amount to be determined at that time based on updated taxable income projections for 2020. CBL's common dividend previously declared on February 25, 2019, and payable on April 16, 2019, will be paid as declared.

148. The March 2019 8-K, signed by Defendant Khaleel, finally disclosed the full amount in losses incurred by the Company ($90 million), which included all of the plaintiffs' claimed damages ($60 million), as well as the attorney's fees ($28 million), with other costs.

149. The March 2019 8-K stated the following about the settlement of the Racketeering Litigation:

> **On March 20, 2019, the board of directors of CBL & Associates Properties, Inc. ("we" or the "Company") approved the structure of a settlement in the class action lawsuit filed on March 16, 2016 in the United States District Court for the Middle District of Florida** (the "Court") by Wave Lengths Hair Salons of Florida, Inc. d/b/a Salon Adrian. As previously disclosed, plaintiff's motion for class certification of a nationwide RICO class and a Florida RICO and FDUTPA (Florida Deceptive and Unfair Trade Practices Act) class was partially granted by the Court

42

on January 7, 2019. In its action, plaintiff sought unspecified monetary damages as well as costs and attorneys' fees, based on allegations that we and certain affiliated entities overcharged tenants at bulk metered malls for electricity.

Our petition seeking to appeal the Court's class certification order was denied by the United States Court of Appeals for the Eleventh Circuit on March 4, 2019. On March 11, 2019, the Court set the trial date for April 2, 2019. On March 15, 2019, following mediation proceedings, a proposed structure of a settlement was approved by representatives of the parties.

Under the terms of the proposed settlement, we have denied all allegations of wrongdoing and have asserted that our actions have at all times been lawful and proper.

***Under the terms of the proposed settlement, we are to set aside a common fund with a monetary and non-monetary value of $90 million*** (the "Common Fund") to be disbursed to class members in accordance with a formula to be agreed upon by the parties that is based upon aggregate damages of $60 million. Class members will be comprised of past and current tenants at certain of our shopping centers that we own or formerly owned during the class period, which will extend from January 1, 2011 through the date of Court preliminary approval. Class members who are past tenants and make a claim will receive payment of their claims in cash. Class members who are current tenants will receive monthly credits against rents and future charges over the next five years. Any amounts under the settlement allocated to tenants with outstanding amounts payable to the Company, including tenants which have declared bankruptcy or declare bankruptcy over the relevant period, will first be deducted from the amounts owed to the Company. All attorney's fees and associated costs to be paid to Class Counsel (which is expected to total a maximum of $28.0 million) and class administration costs (which are expected to not exceed $150,000), will be funded by the Common Fund, but must be approved by the court.

Under the terms of the proposed settlement, we will not pay any dividends to holders of our common shares payable in the third and fourth quarters of 2019. The settlement does not restrict our ability to declare dividends payable in 2020 or in subsequent years.

Under the terms of the proposed settlement, once we have made all required payments and credits, we will have no further payment obligation to the class members. We and our affiliates will receive a general release from the class members for all claims as of the date of final approval by the Court that relate to or arise out of any charges for electricity of any kind, including but not limited to claims that relate to or arise out of the allegations made in the action.

Under the terms of the proposed settlement, the parties will jointly move to stay pending litigation. During such time, counsel for the parties shall work cooperatively to draft final settlement documents with a goal to finalize the settlement agreement and file a motion for preliminary approval by the Court no later than May 29. The settlement is subject to a number of conditions, including Court approval.

As noted above, we have denied all allegations of wrongdoing and have asserted that our actions have at all times been lawful and proper. However, given the class

certification, the accelerated trial schedule, the inherent risk of any trial and the potential cost of an adverse resolution of the litigation, we believe that the settlement is in the Company's best interest and in the best interests of our stockholders.

(Emphasis added).

150.    Following the March 2019 Press Release and 8-K, CBL's stock price fell $0.47 per share (about 25%) on an extremely high trading volume of 11.7 million shares, from a March 26, 2019 close of $1.91 to close at $1.44 on March 27, 2019. The CBL Series D preferred shares fell by $0.74 (7%), and CBL Series E fell $0.69 in two days.

### Repurchases During the Relevant Period

151.    During the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company. In total, the Company spent an aggregate amount of $453,943 to repurchase 122,355 shares of its own common stock at artificially inflated prices from November 1, 2017 through February 28, 2019.

152.    As the Company stock was actually only worth $1.00 per share, the price at closing on April 25, 2019, the Company overpaid $331,588 in total for these repurchases.

153.    According to the Company's 2017 10-K, during November 2017 the Individual Defendants caused the Company to repurchase 100 shares of its own stock at an average price per share of $5.69, for a total cost to the Company of $569.[9] In December 2017, the Individual Defendants caused CBL to repurchase 11,928 shares of its own stock at an average price per share of $5.60, for a total cost of $66,796.

---

[9] Upon information and belief, these shares were repurchased during the Relevant Period.

154.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $4.69 more than the actual worth of each share between November 1, 2017 and November 30, 2017. CBL overpaid $4.60 more than the actual worth of each share between December 1, 2017 and December 31, 2017. Thus, the total overpayment by the Company for repurchases of its own stock between November 1, 2017 and December 31, 2017 was $55,337.

155.    According to the Company's 1Q18,[10] during January 2018 the Individual Defendants caused the Company to repurchase 525 shares of its own stock at an average price per share of $5.58, for a total cost to the Company of $2,929.50. In February 2018, the Individual Defendants caused CBL to repurchase 46,151 shares of its stock at an average price per share of $4.95, for a total cost of $228,447.

156.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $4.58 more than the actual worth of each share between January 1, 2018 and January 31, 2018. CBL overpaid an average of $3.95 per share between February 1, 2018 and February 28, 2018. Thus, the total over payment by the Company for repurchases of its own stock between January 1, 2018 and February 28, 2018 was $184,700.

157.    According to the Company's 2Q18, during May 2018, the Individual Defendants caused the Company to repurchase 96 shares of its own stock at an average price per share of $4.44, for a total cost to the Company of $426.

---

[10] All repurchases disclosed in the Company's Form 10-Q filings are shares surrendered by employees to satisfy state and federal income tax requirements related to vesting of restricted stock shares. The average price per share was the market value of the stock on the day the restricted stock vested, and this price was used to calculate how much stock needed to be purchased to meet income tax requirements.

158. Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $3.44 more than the actual worth of each share between May 1, 2018 and May 31, 2018. Thus, the total over payment by the Company for repurchases of its own stock between May 1, 2018 and May 31, 2018 was $330.

159. According to the Company's 3Q18, during July 2018 the Individual Defendants caused the Company to repurchase 166 shares of its own stock at an average price per share of approximately $5.80, for a total cost to the Company of $962. In August 2018, the Individual Defendants caused CBL to purchase 744 shares at an average price per share of $5.10, for a total cost of $3,794.

160. Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $4.80 more than the actual worth of each share between July 1, 2018 and July 31, 2018. CBL overpaid on average $4.10 between August 1, 2018 and August 31, 2018. Thus, the total over payment by the Company for repurchases of its own stock between July 1, 2018 and August 31, 2018 was $3,847.

161. According to the Company's 2018 10-K, during November 2018 the Individual Defendants caused the Company to repurchase 357 shares of its own stock at an average price per share of approximately $3.02, for a total cost to the Company of $1,078. During December 2018, the Individual Defendants caused CBL to repurchase 7,073 shares of stock at an average price per share of $2.40, for a total cost of $16,975.

162. Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company

paid on average $2.02 more than the actual worth of each share between November 1, 2018 and November 30, 2018. CBL overpaid an average of $1.40 per share between December 1, 2018 and December 31, 2018. Thus, the total over payment by the Company for repurchases of its own stock between November 1, 2018 and December 31, 2018 was $10,623.

163. According to the Company's Form 10-Q filed with the SEC on May 10, 2019, in February 2019 the Individual Defendants caused the Company to repurchase 55,215 shares of its own stock at an average price per share of $2.39, for a total cost to the Company of $131,963.

164. Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $1.39 more than the actual worth of each share between February 1, 2019 and February 28, 2019. Thus, the total over payment by the Company for repurchases of its own stock in February 2019 was $76,748.

165. In total, the Company overpaid an aggregate amount of $331,588 for repurchases of its own stock during the period of time in which the Company made false and misleading statements and omissions.

**<u>DAMAGES TO CBL</u>**

166. As a direct and proximate result of the Individual Defendants' conduct, CBL has lost and expended, and will lose and expend, many millions of dollars.

167. Such expenditures include, but are not limited to, legal fees associated with the Racketeering Litigation and the Securities Class Action filed against the Company and Defendants S. Lebovitz, C. Lebovitz, Chapman, and Khaleel, and amounts paid to outside lawyers, accountants, and investigators in connection thereto and in connection with the Overcharge Misconduct, and losses of revenues caused by customers' loss of trust in the Company's business.

47

168.     Such losses include, but are not limited to, $331,588 that the Company overpaid, at the direction of the Directors, for the Company's repurchases of its own stock at artificially inflated prices.

169.     Additionally, these expenditures also include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

170.     As a direct and proximate result of the Individual Defendants' conduct, CBL has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

171.     Plaintiff brings this action derivatively and for the benefit of CBL to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of CBL, waste of corporate assets, and unjust enrichment, and violations of Sections 10(b), 14(a), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

172.     CBL is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

173.     Plaintiff is, and has continuously been at all relevant times, a CBL shareholder. Plaintiff will adequately and fairly represent the interests of CBL in enforcing and prosecuting its

48

rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

174. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

175. A pre-suit demand on the Board of CBL is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven Individual Defendants: Defendants S. Lebovitz, C. Lebovitz, Chapman, Dominski, Griffith, Lieb, Nelson (collectively, the "Directors"). Plaintiff only needs to allege demand futility as to four of the seven Directors that are on the Board at the time this action is commenced.

176. Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make the false and misleading statements and omissions of material fact, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

177. In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

178.    According to the 2018 and 2019 Proxy Statements, the Board has the ultimate oversight responsibility. In this regard, the Company stated the following in the 2019 Proxy Statement:

> Our Board is responsible for overseeing our risk management. The Board administers its risk oversight function through (1) the review and discussion of regular periodic reports to the Board and its committees on topics relating to the risks that the Company faces, including, among others, market conditions, tenant concentrations and credit worthiness, leasing activity, the status of current and anticipated development projects, compliance with debt covenants, management of debt maturities, access to debt and equity capital markets, cyber-security risks and threat mitigation related to our technology and information systems, ***existing and potential legal claims against the Company*** and various other matters relating to the Company's business; (2) the required approval by the Board of Directors (or a committee thereof) of significant transactions that entail the expenditure of funds or ***incurrence of debt or liability in amounts in excess of certain threshold dollar amounts***… (4) the direct oversight of specific areas of the Company's business by the Compensation, Audit and Nominating/Corporate Governance Committees.

(Emphasis added).

179.    Moreover, those Directors holding a position on the Audit Committee had even more oversight responsibilities.  In this regard, the Company stated the following in the 2019 Proxy Statement regarding the Board's committees:

### Audit Committee

> The Audit Committee is responsible for the engagement of the independent auditors and the plans and results of the audit engagement. The Audit Committee approves audit and non-audit services provided by the independent auditors and the fees for such services and reviews the adequacy of the Company's internal accounting controls as well as the Company's accounting policies and results and ***management's policies with respect to risk assessment and risk management***. The Audit Committee also exercises certain oversight responsibilities concerning the Company's use of interest rate hedging instruments to manage our exposure to interest rate risk (including but not limited to entering swaps for such purpose and the exemption of any such swaps from applicable execution and clearing requirements), and under the Company's Related Party Transactions Policy, as described herein under the section entitled "Certain Relationships and Related Person Transactions."
> The Board of Directors has determined that each member of the Audit Committee is an Independent Director pursuant to the independence requirements of Sections 303A.02 and 303A.07(b) of the listing standards of the NYSE…

50

(Emphasis added).

180.    Additional reasons that demand on Defendant S. Lebovitz is futile follow. Defendant S. Lebovitz is a Company director and its CEO, and is thus, as the Company admits, a non-independent director. He has received and continues to receive lavish compensation, most recently receiving $3,472,388 in compensation during the 2018 fiscal year. Defendant S. Lebovitz was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings, to all of which he either attached his signature or a SOX certification. Accordingly, he is especially culpable for the misconduct described herein, including the Board's oversight and mismanagement of the Company. Moreover, Defendant S. Lebovitz is a defendant in the Securities Class Action. As the highest executive officer, a director, and a member of the Executive Committee, Defendant S. Lebovitz conducted little, if any, oversight of the Company's engagement in the Overcharge Misconduct, internal controls over public reporting of financial statements, and of the Company's engagement in the scheme to make false and misleading statements and omissions of material fact described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant S. Lebovitz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

181.    Additional reasons that demand on Defendant C. Lebovitz is futile follow. Defendant C. Lebovitz is employed as Chairman of the Board and Chair of the Executive Committee; thus, as the Company admits, he is not an independent director. He has received and continues to receive lavish compensation, most recently receiving $2,540,247 in compensation

51

during the 2018 fiscal year. By participating in and/or facilitating the schemes alleged herein, Defendant C. Lebovitz egregiously failed in his duties as a director and specifically, as Chairman of the Board. As Chairman of the Board and Chair of the Executive Committee, Defendant C. Lebovitz conducted little, if any, oversight of the Company's engagement in the Overcharge Misconduct, internal controls over public reporting of financial statements, and of the Company's engagement in the scheme to make false and misleading statements and omissions of material fact described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant C. Lebovitz is a defendant in the Securities Class Action Thus, for these reasons, too, Defendant C. Lebovitz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

182. Additional reasons that demand on Defendant Khaleel is futile follow. As an executive officer, namely the Company's CFO, Defendant Khaleel conducted little, if any, oversight of the Company's engagement in the Overcharge Misconduct, internal controls over public reporting of financial statements, and of the Company's engagement in the scheme to make false and misleading statements and omissions of material fact described herein, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. She has received and continues to receive handsome compensation, most recently receiving $1,283,157 in compensation during the 2018 fiscal year. Defendant Khaleel was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings, to all of which she attached her signature and/or a SOX certification. Moreover,

52

Defendant Khaleel is a defendant in the Securities Class Action. Thus, for these reasons, too, Defendant Khaleel breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

183.    Additional reasons that demand on Defendant Chapman is futile follow. He has received and continues to receive handsome compensation, most recently receiving $180,000 in compensation during the 2018 fiscal year. Defendant Chapman was Chair of the Audit Committee during the Relevant Period and is thus especially culpable for the systematic, willful, or reckless oversight of the fraud alleged herein. As a director, Chair of the Audit Committee, and member of the Compensation Committee, Defendant Chapman conducted little, if any, oversight of the Company's engagement in the Overcharge Misconduct, internal controls over public reporting of financial statements, and of the Company's engagement in the scheme to make false and misleading statements and omissions of material fact described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Chapman is a defendant in the Securities Class Action. Thus, for these reasons, too, Defendant Chapman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

184.    Additional reasons that demand on Defendant Dominski is futile follow. He has received and continues to receive handsome compensation, most recently receiving $205,000 in compensation during the 2018 fiscal year. Defendant Dominski was a member of the Audit Committee during the Relevant Period and is thus especially culpable for the systematic, willful, or reckless oversight of the fraud alleged herein. As a director, Chair of the Compensation Committee, and member of the Audit Committee, Defendant Dominski conducted little, if any,

oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements and omissions of material fact and the other schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Dominski breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

185. Additional reasons that demand on Defendant Griffith is futile follow. He has received and continues to receive handsome compensation, most recently receiving $170,000 in compensation during the 2018 fiscal year. As a director and member of the Compensation Committee and the Nominating/Corporate Governance Committee, Defendant Griffith conducted little, if any, oversight of the Company's engagement in the Overcharge Misconduct, internal controls over public reporting of financial statements, and of the Company's engagement in the scheme to make false and misleading statements and omissions of material fact described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Griffith breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

186. Additional reasons that demand on Defendant Lieb is futile follow. He has received and continues to receive handsome compensation, most recently receiving $175,000 in compensation during the 2018 fiscal year. Defendant Lieb was a member of the Audit Committee during the Relevant Period and is thus especially culpable for the systematic, willful, or reckless

oversight of the fraud alleged herein. As a director and member of the Audit and Nominating/Corporate Governance Committees, Defendant Lieb conducted little, if any, oversight of the Company's engagement in the Overcharge Misconduct, internal controls over public reporting of financial statements, and of the Company's engagement in the scheme to make false and misleading statements and omissions of material fact described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Lieb breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

187.    Additional reasons that demand on Defendant Nelson is futile follow. She has received and continues to receive handsome compensation, most recently receiving $175,000 in compensation during the 2018 fiscal year. As a director, Chair of the Nominating/Corporate Governance Committee, and member of the Executive Committee, Defendant Nelson conducted little, if any, oversight of the Company's engagement in the Overcharge Misconduct, internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements and omissions of material fact described herein, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Thus, for these reasons, too, Defendant Nelson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

188.    Additional reasons that demand on the Board is futile follow.

55

189.    The Directors, as members of the Board, were and are subject to the Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code of Conduct requires all employees, officers, and directors to avoid activities or relationships that conflict with the Company's interests or adversely affect the Company's reputation. The Directors violated the Code of Conduct because, *inter alia*, they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Directors violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

190.    The Directors, as members of the Board, were and are subject to the Corporate Guidelines. The Corporate Guidelines go well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. Rather, the Corporate Guidelines require the Board to provide effective governance over the Company's affairs for the benefit of stockholders, to ensure that management is capably executing its responsibilities, to use their free access to management to obtain all information necessary to fulfill their duties, and to evaluate the Company's executives. The Directors did not comply with the requirements of the Corporate Guidelines. The Directors violated the Corporate Guidelines because, *inter alia*, they participated in or were recklessly unaware of the materially false and misleading statements and/or omissions contained in the Company's public filings and communications, and in failing to maintain proper internal controls and regulatory compliance. Because the Directors violated the Corporate Guidelines, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

191. Furthermore, demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other.

192. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and its shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

193. For example, Defendant S. Lebovitz is the son of Company founder and fellow director Defendant C. Lebovitz, it is unlikely that either of these Defendants will take legal action against the other. For this reason, too, demand upon each of them is futile and, therefore, excused.

194. CBL has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for CBL any part of the damages CBL suffered, and will continue to suffer, thereby. Thus, any demand on the Directors would be futile.

195. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment, as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

196.    The acts complained of herein constitute violations of fiduciary duties owed by CBL's officers and directors, and these acts are incapable of ratification.

197.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of CBL. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of CBL, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

198.    If there is no directors' and officers' liability insurance, then the Directors will not cause CBL to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

199.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least four of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

200. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

201. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding CBL. Not only is CBL now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon CBL by the Individual Defendants. When the price of its common stock was trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase approximately $453,943 of its own shares on the open market at artificially inflated prices, damaging CBL.

202. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

203. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about CBL not misleading.

204. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and

did control the conduct complained of herein and the content of the public statements disseminated by CBL. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

205. In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, made and signed the 2017 and 2018 10-Ks filed with the SEC during the Relevant Period.

206. By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

207. Plaintiff on behalf of CBL has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

208. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

209. The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not

sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

210. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

211. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

212. Under the direction and watch of the Directors, the 2018 Proxy Statement failed to disclose, *inter alia*: (1) that the Company had engaged in the Overcharge Misconduct; (2) that the Company consequently faced a significant, non-routine lawsuit; (3) the substance of the claims against the Company; (4) the approximate amount of damages claimed; (5) the lack of insurance coverage for the potential loss; and (6) that the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

213. Under the direction and watch of the Directors, the 2019 Proxy Statement failed to disclose, *inter alia*: (1) that the Racketeering Litigation had been settled; (2) the amount of the settlement fund; and (3) that the Company failed to maintain internal controls.

214. The Individual Defendants also caused the 2018 and 2019 Proxy Statements (the "Proxy Statements") to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements including equity awards designed to "align our senior executives' long-term interests with those of our shareholders and serve as a disincentive to behavior that is focused only on the short-term and risks material harm to the Company," while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

215. The Proxy Statements also made references to the Code of Conduct, which required the Company and the Individual Defendants to abide by relevant laws and regulations and to make accurate and non-misleading public disclosures. By issuing false and misleading statements to the investing public, the Individual Defendants violated the Code of Conduct. The Proxy Statements failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

216. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. These misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination

62

in the Proxy Statements, including, but not limited to the election of directors, ratification of an independent auditor, and the approval of executive compensation.

217.    The false and misleading elements of the Proxy Statements led to the re-election of Defendants C. Lebovitz, S. Lebovitz, Bryenton, Chapman, Dominski, Griffith, Lieb, Nay, and Nelson, which allowed them to continue breaching their fiduciary duties to CBL.

218.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

219.    Plaintiff on behalf of CBL has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Violations of Section 20(a) of the Exchange Act

220.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

221.    The Individual Defendants, by virtue of their positions with CBL and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of CBL and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause CBL to engage in the illegal conduct and practices complained of herein.

222.    Plaintiff on behalf of CBL has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

223.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

224. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of CBL's business and affairs.

225. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

226. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of CBL.

227. In breach of their fiduciary duties, the Individual Defendants knowingly or recklessly cause the Company to engage in the Overcharge Misconduct.

228. In breach of their fiduciary duties owed to CBL, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*: (1) that the Company had engaged in the Overcharge Misconduct; (2) that the Company faced a significant lawsuit; (3) the substance of the claims against the Company; (4) the approximate amount of damages claimed; (5) the lack of insurance coverage for the potential loss; and (6) that the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

229. The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

230.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in repurchasing of approximately $453,943 worth of CBL stock at artificially inflated prices.

231.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of CBL's securities.

232.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants, and especially Defendants S. Lebovitz and Khaleel who expressly reviewed the Company's financials, had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of CBL's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

233.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

234. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, CBL has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

235. Plaintiff on behalf of CBL has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

236. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

237. By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, CBL.

238. The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from CBL that was tied to the performance or artificially inflated valuation of CBL, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

239. Plaintiff, as a shareholder and a representative of CBL, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from over-compensation, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

240. Plaintiff on behalf of CBL has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

66

241.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

242.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused CBL to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose business from customers who no longer trust the Company.

243.    The Individual Defendants have also caused CBL to waste and to overpay $331,588 through harmful and wasteful repurchases during the Relevant Period, as alleged herein.

244.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

245.    Plaintiff on behalf of CBL has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of CBL, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to CBL;

(c)    Determining and awarding to CBL the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing CBL and the Individual Defendants to take all necessary actions

to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect CBL and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of CBL to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding CBL restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

68

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: July 22, 2019
                                              Respectfully submitted,

                                              s/ Wade B. Cowan
                                              Wade B. Cowan (SC#9403)
                                              85 White Bridge Road, Suite 300
                                              Nashville, Tennessee 37205
                                              Telephone: (615) 256-8125
                                              Facsimile: (615) 242-7853
                                              Email: wcowan@dhhrplc.com

                                              The Brown Law Firm, P.C.
                                              Timothy Brown
                                              240 Townsend Square
                                              Oyster Bay, NY 11771
                                              Telephone: (516) 922-5427
                                              Facsimile: (516) 344-6204
                                              Email: tbrown@thebrownlawfirm.net

                                              *Attorneys for Plaintiff*